**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

  **v.**                                            **Crim. Action No. 1:19-cr-12**
                                                                         **(Judge Kleeh)**

**GUILLERMO SANTIAGO-FRANCISCO,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO SUPPRESS [ECF NO. 29]**

On January 8, 2019, the grand jury returned a one-count indictment against Guillermo Santiago-Francisco ("Defendant"), charging him with Fraud and Misuse of Document, in violation of 18 U.S.C. § 1546(a). Pending before the Court is a motion to suppress evidence [ECF No. 29]. The Court held an evidentiary hearing on the motion on March 20, 2019. At the hearing, counsel for Defendant advised the Court that Defendant is no longer challenging whether Defendant's consent to the search of his home was valid. Therefore, the only issue currently before the Court is the validity of the traffic stop that led to Defendant's indictment. The parties filed supplemental briefing on the traffic stop issue. For the reasons set forth below, the Court finds that the traffic stop was valid and, therefore, **DENIES** the pending motion to suppress [ECF No. 29].

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO SUPPRESS [ECF NO. 29]**

I.   <u>BACKGROUND</u>[1]

In October 2018, federal agents from Immigration and Customs Enforcement ("ICE") and Diplomatic Security Service ("DSS") conducted an operation in Clarksburg, West Virginia. The operation stemmed from the alleged kidnapping of a 16-year-old girl in a Kroger parking lot. The two suspects in the alleged kidnapping were Daniel Perez ("Perez") and Juan Carlos De Leon Zanas ("Zanas").[2] In early December 2018, federal agents had obtained arrest warrants for both men and were conducting surveillance on a home at 901 Tiano Lane, Clarksburg, West Virginia, in which they believed the individuals lived. They also conducted surveillance at El Rey, a Mexican restaurant in Clarksburg, where agents believed the suspects may have been working. As part of the investigation, officers with the Clarksburg Police Department ("CPD"), at the request of federal agents, conducted a traffic stop that led to Defendant's indictment in this action.

A.   **Leading up to the Stop**

DSS Special Agent Christopher Holmes ("Holmes") and ICE Agent Gary Olcott ("Olcott") were working together on the investigation to find Perez and Zanas. On December 10, Olcott emailed Holmes to

---

[1] The Court makes these factual findings based on testimony elicited at the March 20, 2019, suppression hearing and the parties' briefs.
[2] Defendant has not been associated with any of these allegations in any way whatsoever. However, this alleged incident appears to be the genesis of the investigation that ultimately led to Defendant's arrest and indictment.

2

let him know he had run the addresses Holmes previously provided. Olcott sent him two names of individuals with prior immigration encounters, Mateo Delunas and Javier Rosario-Azamar ("Rosario-Azamar"), along with photographs of the two men. Holmes then went through still images from his surveillance videos at Tiano Lane and sent Olcott two candidates he thought were very likely matches, one of whom was Rosario-Azamar, a Mexican national believed to have no legal status and a prior history of deportation. He was believed to have reentered the country illegally, a felony offense under 8 U.S.C. § 1326(a). Holmes testified that he was aware of Rosario-Azamar's criminal history prior to the traffic stop at issue.

On December 11, Holmes conducted surveillance at El Rey. He observed Rosario-Azamar taking out the trash twice. Olcott was in the car with Holmes. Holmes testified that they determined the man was Rosario-Azamar because the photographs matched his description perfectly, and his mustache, in particular, was recognizable. Holmes compared two sets of photographs to the individual he saw at El Rey: those from Tiano Lane surveillance and those provided by Olcott. Holmes also observed a gold Toyota Camry drive to the residence on Tiano Lane that day. At this point, Holmes believed Rosario-Azamar was residing at Tiano Lane.

**B.   The Stop**

The next day, Holmes explained to CPD officers that there were several individuals in the home at Tiano Lane who were likely illegal immigrants and targets of an investigation. He asked CPD to conduct a traffic stop. Their goal was to find Perez. CPD officers set up near the residence on Tiano Lane. Holmes advised them that the target vehicle -- a gold Toyota -- would be leaving the residence shortly and that he would contact them via telephone when it was getting ready to leave so that CPD could initiate a traffic stop if appropriate.

Holmes testified that while watching the residence at Tiano Lane, one individual repeatedly exited the front door, "messed with" the Toyota Camry, and went back inside. Then four men exited the back of the house, walked to the front of the house, and entered the vehicle. Holmes said he could readily identify Rosario-Azamar as one of the men. Holmes was unsure about the identities of the other occupants of the vehicle. The Toyota Camry then drove off. Holmes notified CPD officers and Olcott that the subjects were leaving. A CPD officer sounded his siren, activated his emergency lights, and initiated a traffic stop. Neither the driver nor the other occupants committed any traffic violations.

Two CPD officers involved in the traffic stop testified that they knew the stop was related to illegal immigration and that

federal agents had reason to believe some of the residents at Tiano Lane were in the country illegally. CPD officers did not know any specific details of the case. They did not have information about the nature of the alleged crime or the individuals involved. They were simply assisting in the federal investigation.[3] The officer who initiated the stop testified that he had no prior involvement in the investigation before that day and no history of working with Holmes or Olcott. After the traffic stop, police identified the vehicle's occupants and, ultimately, obtained Defendant's allegedly fraudulent social security card and permanent residence card.

**C.    Agent Holmes's Identification of Rosario-Azamar**

Holmes testified that he was able to identify Rosario-Azamar on December 12 based on his surveillance photographs, ICE photographs, and his seeing Rosario-Azamar twice the day before at El Rey. He testified that Rosario-Azamar had a "very apparent" mustache. He also recognized Rosario-Azamar's posture and testified that he was the same individual he had seen the prior day. Holmes admitted he had never heard Rosario-Azamar's name before December 2018 and that he did not know him. He testified that he did not know where Olcott received the photographs of

---

[3] Holmes testified that both ICE and DSS routinely ask local law enforcement to assist in investigations such as this for safety reasons.

Rosario-Azamar. Holmes did not know Rosario-Azamar's height or weight. He did not obtain fingerprints, DNA, or any other biometrics. He did not employ any facial recognition software.

When Holmes obtained surveillance videos and a photograph from ICE, he was initially able to compare the two photographs. On December 11, while conducting surveillance at El Rey, he saw Rosario-Azamar twice and got "good clear looks." On December 12, he saw the same person coming out of the house on Tiano Lane. He was "very confident" that it was the same person at Tiano Lane who was at El Rey and in the photographs. Holmes had seen him personally and in photographs multiple times during December 10, 11, and 12. Olcott was with Holmes during the El Rey surveillance on December 11.

Holmes testified that aside from the mustache, Rosario-Azamar had a recognizable shadow of his nose and position of his eyes. He recognized the angle of his mustache. Holmes did not recognize any scars, and the suspect did not have a facial deformity. He testified that he could reasonably conclude it was Rosario-Azamar.

## II. APPLICABLE LAW

The Fourth Amendment to the Constitution of the United States provides that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. It is well-established that "[a]

traffic stop is a 'seizure' within the meaning of the Fourth Amendment and must be reasonable under the circumstances." United States v. Palmer, 820 F.3d 640, 648 (4th Cir. 2016) (citing Delaware v. Prouse, 440 U.S. 648, 653-54 (1979)). A seizure, such as a traffic stop, must be supported by "a 'reasonable suspicion,' based on articulable, particularized facts, that 'criminal activity may be afoot.'" United States v. McCoy, 513 F.3d 405, 410-11 (4th Cir. 2008) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

Reasonable suspicion "defies precise definition." Id. at 411. In determining whether reasonable suspicion exists, courts "look to the totality of the circumstances." Id. The Supreme Court of the United States has "counseled lower courts to give 'due weight' to the factual inferences drawn by police officers as they investigate crime." Id. (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). An officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

Under the collective-knowledge doctrine, as the United States Court of Appeals for the Fourth Circuit has written, "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to

justify taking such action [him]self; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011). In United States v. McRae, the Fourth Circuit wrote that under this doctrine, "reasonable suspicion may be based on the collective knowledge of the officers involved in an investigation." 336 F. App'x. 301, 305 (4th Cir. 2009).

### III. ANALYSIS

After considering the parties' briefing, the testimony offered at the March 20, 2019, hearing, and the applicable law, the Court finds that the traffic stop was constitutional. Holmes had reasonable, articulable suspicion to believe that Rosario-Azamar, who was known by law enforcement to be in the country illegally with a prior deportation in violation of federal law,[4] was in the Toyota Camry at the time of the traffic stop on December 12, 2018. Holmes had seen Rosario-Azamar both personally and in photographs multiple times over a span of a few days. He also had the benefit of the assistance of Olcott during that time.

Holmes was able to identify Rosario-Azamar as he entered the Toyota Camry on December 12 on three different bases: (1) his surveillance photographs; (2) ICE photographs; and (3) his seeing

---

[4] 8 U.S.C. 1326(a).

Rosario-Azamar twice the prior day at El Rey. During the surveillance at El Rey, Olcott was with Holmes and recognized Rosario-Azamar as well. Holmes testified that while at El Rey, he got "good, clear looks." When he saw Rosario-Azamar exit the house at Tiano Lane on December 12, Holmes was "very confident" that it was the same person.

Holmes was able to describe a number of identifying features of Rosario-Azamar. First and foremost, Holmes testified that Rosario-Azamar had a "very apparent" mustache. Holmes also testified to a number of other distinguishing features: posture, shadow of his nose, and position of his eyes. It is not necessary for law enforcement officers to obtain fingerprints, DNA evidence, or other biometrics in order to identify someone. It is not necessary to employ facial recognition software or to ascertain a suspect's exact height and weight. To require these undertakings during every investigation would unduly hinder law enforcement officers in their efforts. Finally, it is clear that police may conduct an investigatory stop when they have reasonable, articulable suspicion that any crime is occurring. It is irrelevant which crimes (i.e. traffic violations) most often trigger a stop.

Holmes did not need to know beyond a reasonable doubt that it was Rosario-Azamar who exited the home on Tiano Lane and entered the Toyota Camry. At a minimum, Holmes had reasonable suspicion

that Rosario-Azamar, someone law enforcement believed to be violating immigration laws, entered the vehicle. Holmes had significant opportunities to observe Rosario-Azamar in person and observe photographs of him. He was sufficiently familiar with Rosario-Azamar before seeing him get into the Toyota Camry on December 12 and notifying CPD to conduct a traffic stop. His personal knowledge, which constituted a reasonable, articulable suspicion, was imputed to the arresting officer via the collective-knowledge doctrine. Therefore, the Court finds that the traffic stop was constitutionally sound. The evidence stemming from it is admissible, and Defendant's motion to suppress is denied.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant's motion to suppress [ECF No. 29]

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Order to counsel of record, all appropriate agencies, and the Interpreter, Johnnie Benningfield.

DATED: March 27, 2019

*/s/ Thomas S. Kleeh*
THOMAS S. KLEEH
UNITED STATES DISTRICT JUDGE